The Goldsby King Memorial Hospital, a corporation, v. Commissioner.
Goldsby King Mem. Hosp. v. Commissioner
Docket No. 204.
United States Tax Court
1944 Tax Ct. Memo LEXIS 176; 3 T.C.M. (CCH) 693; T.C.M. (RIA) 44233; July 19, 1944
*176 The petitioner was organized exclusively and, during the taxable years, was operated exclusively for charitable purposes and no part of its net income inured to the benefit of any private shareholder or individual; nor was any part of its activities the carrying on of propaganda, or otherwise attempting to influence legislation. Held, that it was therefore exempt from taxation under the provisions of the applicable Revenue Acts. A corporation otherwise exempt is not deprived of exemption because it incidentally carries on profitable activities in furtherance of its predominant charitable purpose. E. W. Pettus, Esq., Box 475, Selma, Ala., for the petitioner. Frank M. Thompson, Jr., Esq., for the respondent. TYSON
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the petitioner's income tax as follows: Taxable Year Ending
Deficiency
March 31, 1929
$ 327.45
March 31, 1930
2,560.02
December 31, 1933
1,559.75
December 31, 1934
667.13
December 31, 1935
1,618.70
December 31, 1936
4,586.45
December 31, 1937
3,365.68
December 31, 1938
1,090.64
December 31, 1939
758.15
Total
$16,533.97
These deficiences result from respondent's determination *177 that petitioner "is not exempt from Federal income taxation under the provisions of Section 101 (6) of the Internal Revenue Code and the corresponding sections of prior revenue acts for the taxable years 1929 to 1939, inclusive." Petitioner contests this determination. The proceeding has been submitted upon an oral stipulation of facts made at the hearing, oral testimony, and exhibits. [Findings of Fact] The petitioner is a corporation organized under the general corporate laws of the State of Alabama in April 1921, with its principal place of business in Selma, Alabama. Its certificate of incorporation states: "The object and purpose for which this corporation is formed, is to establish, maintain, operate, and conduct a hospital or hospitals, sanitoriums and sanatori for the medical, surgical and obstetrical treatment, care and cure of patients, together with laboratories and other establishments, necessary, incidental or useful in the conduct of a modern well conducted hospital, and generally to do and engage in all business, useful or profitable in connection with the operation of said hospital, or hospitals and all such business usual or appertaining to such hospitals." *178 * * * * *
"The corporation shall have power to purchase, hold, receive by bequest or legacy or devise, or in payment for subscription of stock issued or sold, and to convey or otherwise dispose of, all such real estate and personal property as may be necessary, convenient or useful for the construction, operation, maintenance, and conduct of its business or businesses, or for the management of the same, or as its purposes and objects may require; to borrow money, issue notes, bonds, and other negotiable paper, and to mortgage, pledge or otherwise transfer and convey its property, both real and personal, to secure the payment of money borrowed or any debt contracted and to have and exercise all the powers and rights vested in or conferred on corporations of a similar nature by the laws of said state." The charter provided for a board of directors and for a president, a vice president, and a secretary-treasurer. The charter was amended September 24, 1923 by adding thereto the following new paragraph: "There shall be no dividends or profits distributed among the stockholders but all net profits and net gains arising from the operation and conduct of said business shall be devoted *179 exclusively to charity and applied to expense of care and treatment of charitable and indigent patients." This amendment remained effective throughout the taxable years. The authorized capital stock of petitioner at the time of its organization in 1921 consisted of 350 shares, par value $100, of which 270 shares were issued as follows: Dr. Marcus N. Skinner
111-12/50 shares
Dr. Ira C. Skinner
104-70/100 shares
Dr. B. B. Rogan
32-2/5 shares
Dr. M. M. Strickland
10-4/5 shares
Dr. J. H. Martin
10-4/5 shares
On November 20, 1924, the charter was further amended so as to increase the capital from $35,000 to $40,000. The hospital property which the petitioner corporation operated was conveyed to it in payment for all the above enumerated stock, by Dr. Marcus N. Skinner, trustee, who had acquired it as trustee under a deed executed May 15, 1920. In the deed to Dr. Skinner as trustee a vendor's lien was retained for the payment of a balance on the purchase price and the property was received by the petitioner subject to that lien. No consideration other than the stock was received by the trustee, or anyone else, for the property. During the period beginning April 1, 1928 *180 through June 8, 1938, the 397.5 shares of petitioner's stock outstanding were held as follows: Dr. Marcus N. Skinner
358.5 shares
H. F. Reese
3 shares
P. B. Moss
36 shares
During the period June 9, 1938 to and including December 31, 1939, the 397.5 outstanding shares of petitioner were held as follows: Dr. Marcus N. Skinner
393.5 shares
H. F. Reese
3 shares
P. Y. Donald
1 share
The increase in the number of shares owned by Dr. Skinner, as shown by the above two tabulations, in excess of those issued to him on the organization of petitioner in 1921 was occasioned by his purchases at full value from owners who wished to retire from participation in the affairs of petitioner. The hospital derived its income from charges for x-ray operating room, laboratory services, and patients' room and board; and in addition, rents, or their equivalent of $1,800 for each of the years 1938 and 1939. The hospital's patients were of three classes: those who paid their accounts in full were regarded as "full pay" patients; those who paid only part of their accounts were regarded as "part pay" patients; and those who paid nothing were regarded as "charity" patients. As was *181 customary with other local hospitals, all patients, whether full pay, part pay, or charity, were, for statistical purposes, charged on the hospital books for the full price of the services rendered. No patient has ever been refused admission because of inability to pay. Patients' accounts paid only in part were charged off as bad debts to the extent of that part, and patients' accounts on which nothing was paid were charged off in full as charity. There is no distinction as to the effect of the two methods of charging off such accounts, patients able to pay only part of their accounts being considered charity patients to the extent of the unpaid balance on their accounts. The hospital had 72 beds, of which some were in private rooms and some in wards. Charity patients were usually placed in a ward having from two to six beds. If this arrangement was unsatisfactory they were placed in a private room. There was no difference in the treatment or services received by ward or charity patients from that received by pay patients in private rooms. The ward and charity patients received the same kind of food, the same kind of nursing, the same routine medicine, the same daily baths, the same *182 change of linen, and occupied the same type of beds as did the patients in private rooms; and it cost the hospital as much to maintain each of the ward or charity patients as it did to maintain each of the pay patients in private rooms. The only distinction between the care and treatment of the pay patients in private rooms and the ward or charity patients was that the patients in private rooms had more privacy. The charge for a private room $6was per day and for a bed in a ward $3 per day. The cost per patient per day to the hospital was $4.58 in 1937, $4.25 in 1938, and $4.33 in 1939. The number of patients admitted for the years 1937 to 1939, inclusive, and the number paying their accounts in full, in part, or nothing at all, were as follows: Paid
Paid
Paid
Year
Admitted
In Full
In Part
Nothing
1937
1,460
1,081
173
170
1938
1,612
1,105
293
203
1939
1,689
1,174
306
194
The above figures include as "paid in full" the accounts of between 150 and 180 patients yearly, who were crippled children admitted in wards at a special rate of $2 daily, paid by the state and federal authorities. The crippled children received the same hospital services *183 as full pay patients. The total charges of the hospital against patients admitted during the period April 1, 1929 to December 31, 1939, inclusive, were $754.449.54. Of this amount $79,275.08, or approximately 10 1/2 per cent, was charged off as bad debts, being on accounts partially uncollectible. Also $39,939.10, or about 5 1/3 per cent, was charged off as charity because no part of the account was collected. The total net income of the hospital during that period was $94,774.39. A great many indigent colored patients were operated on without charge in petitioner's hospital. They did not take a bed or room in the hospital over night, but were immediately after the operations returned to the colored hospital from which they came. Such operations were performed because the facilities of petitioner's hospital therefor were far better than those afforded by the colored hospital. The net income and surplus accounts of petitioner for the periods ended March 31, 1929 to March 31, 1932, inclusive, and for the periods ended December 31, 1932 to 1939, inclusive, as disclosed by its returns, were as follows: Taxable Period Ended
Net Income
Surplus
March 31, 1929
$ 5,728.73
($ 268.94) Deficit
March 31, 1930
19,882.15
24,064.57
March 31, 1931
loss (4,944.37)
19,120.20
March 31, 1932
3,955.49
23,075.69
December 31, 1932
loss (6,668.82)
16,406.87
December 31, 1933
11,343.60
28,250.47
December 31, 1934
4,851.87
33,102.34
December 31, 1935
10,772.37
44,874.71
December 31, 1936
18,207.49
63,082.20
December 31, 1937
14,926.32
78,008.52
December 31, 1938
9,502.92
87,511.44
December 31, 1939
7,216.64
94,728.08
*184 During the period March 31, 1929 to December 31, 1939 the hospital liquidated a mortgage of $41,700 on the premises, erected and paid therefor about $55,000 for an addition to the hospital building completed in 1938, and purchased equipment costing $6,160.39, and furniture and fixtures costing $7,648.73. In 1934 the United Charities of Selma made a gift of $1,000 to the hospital. No dividend was ever declared or paid and no salary was ever paid to any stockholder of the petitioner. There was no provision by the city, county, or state governments for the hospitalization of charity patients in the area served by the petitioner, except to the extent above mentioned as to crippled children. Prior to 1931 Dr. Marcus N. Skinner occupied three rooms as business offices in the down town business district of Selma which regularly rented for $50 per month, but a special rate of $25 was given by a drugstore to him as a physician. Office rent in the business district was as high or higher than in the residential district. About 1931 he moved his offices to the hospital where he was joined by an associate physician who acted as his assistant. The hospital was located in the residential district *185 and about three-fourths of a mile from the business district. The move was made in order for Dr. Skinner and his assistant to be closer to the patients and for them to be quickly available in emergency cases, as the hospital had no interne at the time. Dr. Skinner and his assistant occupied two rooms in the hospital as offices. Prior to the occupation of offices in the hospital building in 1938 by other members of the Marcus Skinner Clinic, hereinafter mentioned, Dr. Skinner paid nothing to the hospital for the offices occupied by him and his assistant, but he performed without compensation the duties of superintendant of the hospital which were worth $300 per month, and had the clinical records of the hospital patients kept by his assistant without charge to the hospital, such records for each patient having formerly cost the hospital $2. Dr. Skinner and his assistant also performed the duties of an interne without compensation. The only thing Dr. Skinner received in exchange for such services was the use of his offices in the hospital as a substitute for the down town offices for which he had paid $25 per month. The Marcus Skinner Clinic was organized in 1933 as a business partnership *186 between Dr. Marcus Skinner and other physicians and the membership varied during the years from two to seven. From 1933 to 1938 only one member of the clinic other than Dr. Skinner occupied offices in the hospital; that other member being the physician who had theretofore been Dr. Skinner's assistant. They continued to occupy the two rooms as above stated. In 1938 after the addition to the hospital had been completed two other members of the clinic who had been occupying offices in the down town business district moved their offices to the hospital; and all the nine rooms thereafter occupied by the clinic were in the addition which was air conditioned. The maximum number of phys'cians ever occupying offices in the clinic quarters of the hospital was four. Dr. Skinner as a member of the clinic partnership continued to act as supefintendent of the hospital and he and the other members performed the duties of an interne without compensation when required because of the lack of the services of other internes. There was no financial connection between the clinic and the hospital. The furnishings of the clinic's offices were owned by the various members of the clinic. The x-ray and metabolism *187 machines and the electro-cardiograph machine, which were very expensive, belonged to the clinic, and the operators thereof were paid by the clinic. Full pay, part pay, and charity patients received the benefit of this equipment. The reception room of the clinic was used for the hospital patients and practically all of them were admitted to the hospital through that room. The clinic supplied the hospital with a secretary to handle correspondence and supplied the person who admitted the patients. It also supplied the hospital with x-ray plates, electro-cardiographs, and laboratory chemicals. No charge was made against the hospital for such use of the clinic, its services, its equipment, and supplies. In addition to the use of the clinic, its equipment and supplies, and the services rendered by its members, the clinic paid the hospital $1,800 per year for the occupation of the 9 rooms on the first floor of the addition to the hospital. After the organization of the clinic, the majority of the hospital patients consisted of the clinic's clientele, but the patients of other physicians used the hospital and other physicians practiced there and nearly all the physicians in Selma came there *188 for consultation. No reputable, competent physician was ever refused the privileges of the hospital. The value of the hospital space occupied by the clinic and by Dr. Skinner and his assistant prior to the formation of the clinic did not exceed the value of the services rendered, money paid, and facilities and supplies furnished the hospital by them without charge. In 1929 petitioner applied to respondent for exemption from taxation under the provisions of section 103 (6) of the Revenue Act of 1928 and submitted information to the Commissioner in support of its claim. On the basis of that information the deputy commissioner, by a letter of February 21, 1929 to petitioner, stated that petitioner was exempt under that section and that future returns would not be required so long as there was no change in its organization purposes and method of doing business. In October 1937 the hospital was requested by respondent to answer a questionnaire "In order that it may be determined whether your organization is still operating in such a manner as to qualify it for exemption, * * *." Petitioner answered this questionnaire and on the basis of such information the respondent, on April 28, *189 1938, advised petitioner by letter as follows: "* * * as it appears that there has been no change in your form of organization or activities which would affect your status the previous ruling of the Bureau holding you to be exempt from filing returns of income is affirmed under the Revenue Act of 1936." In 1939 or 1940 three Federal investigators checked the hospital books and consulted with Dr. Marcus Skinner. On October 25, 1940, the following returns were filed under protest in the collector's office: corporation income tax returns for the fiscal years ended March 31, 1929 to 1932, inclusive; and corporation income tax and excess profits tax returns for the calendar years 1933 to 1939, inclusive. Each return bore the following statement: "The Undersigned, In Signing this Return, Still Insists on the Exemption from Income Tax approved by the Commissioner of Internal Revenue under Sec. 101 Sub. 6." It is on the above returns for the fiscal years ended March 31, 1929 and 1930 and for the calendar years 1933 to 1939, inclusive, that the respondent determined the deficiencies herein. No other income tax returns were filed by petitioner for the years 1929 through 1939. A new corporation, *190 the Goldsby King Memorial Hospital Society, was organized under the laws of Alabama on October 27, 1941. On that date, all the stockholders of petitioner, including Dr. Skinner, conveyed their stock to the new corporation in sole consideration of its assuming all the debts and obligations of the petitioner. The charter of the new corporation provided that its purposes were purely charitable; that its net income was to be used exclusively for the hospitalization of charitable and indigent patients; and that no member of the organization should receive any profit or other remuneration. On October 27, 1941, petitioner was dissolved. The petitioner was organized exclusively for charitable purposes and during the taxable years operated exclusively for such purposes. No part of its net income during the taxable years inured to the benefit of any private shareholder or individual. Opinion TYSON, Judge: Under the provisions of section 101 (6) of the I.R.C.[1] and correcsponding provisions of prior revenue acts applicable to the taxable years petitioner claims exemption from the income tax deficiencies determined against it by respondent. *191 Respondent concedes that there is no evidence that any part of petitioner's activities consisted of carrying on propaganda or otherwise attempting to influence legislation during any of the taxable years; and that such a question need not be considered. The following questions are presented: (1) whether petitioner was organized exclusively for charitable purposes; (2) whether it was operated during the taxable years exclusively for such purposes; and (3) whether during the taxable years no part of its net earnings inured to the benefit of any private shareholder or individual. We will first take up the question of whether the petitioner was organized exclusively for charitable purposes. Petitioner was initially organized under its original charter which contains no express provision that its organization was to be exclusively for charitable purposes. However, in about two and one-half years after its initial organization and about five years prior to the beginning of the first taxable year here involved, the charter was formally amended so as to expressly provide that "all net profits and net gains arising from the operation and conduct of said business shall be devoted exclusively *192 to charity and applied to expense of care and treatment of charitable and indigent patients." The charter as so amended continued in effect throughout all the taxable years. In considering the charter provisions as they affect the question of whether petitioner was so organized as to meet the requirement of the applicable statutes we regard the charter as containing the provisions of the amendment which was operative throughout the taxable years and for a period of years prior thereto, since we think that amendment merely expressly "redefined", through clarification and elaboration, the provisions of the original charter relating to the purposes for which petitioner was organized. After the adoption of the amendment the petitioner "ceased to be organized for purposes other than those set forth" in section 101 (6), supra, and corresponding provisions of prior revenue acts applicable to the taxable years. Faulkner v. Commissioner, 112 Fed. (2d) 987. Cf. Slee v. Commissioner, 42 Fed. (2d) 184, 186; and Unity School of Christianity, 4 B.T.A. 61. So, regarding the charter, it would seem *193 to be clear that the petitioner corporation was "organized" exclusively for a charitable purpose within the purview of section 101 (6), supra, and similar statutes, Commissioner v. Battle Creek, Inc., 126 Fed. (2d) 405; Stanford University Book Store v. Helvering, 83 Fed. (2d) 710; Gagne v. Hanover Water Works Co., 92 Fed. (2d) 659; Sand Springs Home, 6 B.T.A. 198; and Banner Building Co., 46 B.T.A. 857, since the purpose of petitioner's organization, as evidenced by its charter, is not overcome by any other evidence in the record. Cf. Roche's Beach, Inc. v. Commissioner, 96 Fed. (2d) 776; Unity School of Christianity, supra; and Journal of Accountancy, Inc., 16 B.T.A. 1260. That both the charter and amendment were issued under the general business corporate laws of Alabama does not preclude the petitioner's having been organized for exclusively charitable purposes. Roche's Beach, Inc. v. Commissioner, supra; *194 Commissioner v. Battle Creek, supra;Unity School of Christianity, supra; and Anderson Country Club, 2 T.C. 1238, 1242. Also, organization for such exclusively charitable purposes is not precluded by the fact that petitioner's charter authorized it to engage in all business which would be usual and profitable in the operation of a hospital. Roche's Beach, Inc. v. Commissioner, supra;Koon Kreek Klub v. Thomas, 108 Fed. (2d) 616; Commissioner v. Battle Creek, supra;Unity School of Christianity, supra;Sand Springs Home, supra, and authorities cited therein. With reference to the question of whether the petitioner was operated for exclusively charitable purposes during the taxable years we must conclude, as we have found to be a fact, that it was. "The exemption of income devoted to charity and * * * were begotten from motives of public policy, and are not to be narrowly construed." Helvering v. Bliss, 293 U.S. 144; Roche'sbeach, Inc. v. Commissioner, supra, *195 and authorities cited therein; Estate of J. B. Whitehead, 3 T.C. 40, 48, and authorities cited therein. No dividend was ever declared or paid and no salary was ever paid to any stockholder of petitioner. That petitioner received income from "full pay" and "part pay" patients as well as rentals from the clinic in 1938 and 1939 does not militate, under the facts here, against the conclusion that petitioner was operated during the taxable years for exclusively charitable purposes. Such income was purely incidental, and apparently necessary, to the pursuit of the charitable purposes for which petitioner was organized. The destination of the income is more significant than its source. Roche's Beach, Inc. v. Commissioner, supra, and authorities cited therein; Koon Kreek Klub v. Thomas, supra;Commissioner v. Battle Creek, supra;Unity School of Christianity, supra; and Sand Springs Home, supra.Although petitioner received net income for each of the years ended March 31, 1929 to 1932, inclusive, and the *196 calendar years 1932 to 1939, inclusive, except for deficits of $4,944.37 and $6,668.82 in the years 1931 and 1932, such income was completely absorbed by the liquidation of a mortgage on its properties, the construction of an addition to its hospital building, and the purchase of equipment, furniture and fixtures, all of which disbursements were reflected in petitioner's surplus in the various applicable years by addition to its fixed assets. The net income having reached its destination by such disbursements was obviously used in the promotion of the exclusively charitable purposes for which the petitioner was organized. Cf. Koon Kreek Klub v. Thomas, supra. What was said with reference to the organization and operation of the sanitarium involved in the Battle Creek case, supra, in which the facts were strikingly like the facts in the instant case, is opposite here: * * * It is not unusual for charters of corporations to grant broad powers and privileges that are never intended to be used. That does not control the specific purposes of the incorporation. It is also usual for hospitals and sanitariums to charge those able to pay for services *197 rendered, in order to pay the expenses of the institution, while not denying treatment to others unable to pay anything. Such institutions are classed as charitable. The following authorities sustain these conclusions: Appeal of Unity School of Christianity, 4 B.T.A. 61; Roche's Beach, Inc., v. Comm., 2 Cir., 96 Fed. (2d) 776; 10 Am. Jur. § 135 "Charities"; Cf. Koon Kreek Klub v. Thomas, 5 Cir., 108 Fed. (2d) 616. Helvering, Comm. v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S. Ct. 285, 80 L. Ed. 278, is not to the contrary. We will now consider the question of whether, during the taxable years, any part of the net earnings of petitioner inured to the benefit of any private shareholder or individual. During the occupancy as offices of the two rooms in the hospital by Dr. Skinner and his assistant, interne services and services in making the clinical records of patients were performed by both, and Dr. Skinner performed services as superintendent worth $3,600 per annum, - all without compensation from the hospital. During *198 the occupancy of the nine rooms in the hospital by the four members of the partnership clinic, the hospital was dependent upon them and their expensive personally owned equipment for all its x-ray, electro-cardiographs, and laboratory needs, which were given without charge. Secretarial and interne services were similarly furnished. Facilities for the admission of hospital patients and the maintenance of their clinical records were handled by them gratuitously. Dr. Skinner as a member of the partnership clinic continued to perform the duties of superintendent. In addition, the clinic paid the hospital $1,800 per year for the two taxable years 1938 and 1939 during which time they occupied the nine rooms in the hospital as offices. In view of such benefits flowing to the hospital and in view of the further fact that three rooms for physicians' offices in the down town business district, where such rents were as high or higher than they were in the residential district such as where the hospital was located, ordinarily rented for $50 per month, we are of the opinion that neither Dr. Skinner nor any other member of the clinic received from their use of offices in the hospital any benefits *199 which were not fully compensated for. We therefore hold, as we have found to be a fact, that no part of the net income of the hospital inured, during the taxable years, to any private shareholder of petitioner or any individual. The respondent makes a contention that there was a possibility that the corporation would be liquidated and its property, or, if sold, the proceeds thereof, would be distributed as assets to Dr. Skinner and the other shareholders; and that, therefore, the net profits represented in such assets would thus inure to the benefit of Dr. Skinner and the other shareholders. He cites in support of this contention as Cf. Uniform Printing & Supply Co. v. Commissioner, 33 Fed. (2d) 445; certiorari denied, 280 U.S. 591. This contention fails to take into consideration the express provision of the amended charter which is as follows: There shall be no dividends or profits distributed among the stockholders, but all net profits and net gains arising from the operation and conduct of said business shall be devoted exclusively to charity and applied to expense of care and treatment of charitable and indigent patients. *200 Moreover, in Koon Kreek Klub v. Thomas, supra, where a kindred contention was rejected, the court distinguished Uniform Printing & Supply Co., supra, by saying that it was a case "in which the original purpose of the organization was to render a service of value or benefit, not within the exemption allowed by the statute." The court further stated that "the exemption (there considered) applies to profits so long as they are retained by the organization or used to further the purposes which are made the basis of the exemption, and are not otherwise used for the benefit of any private shareholder." [Parenthesis supplied.] Such is the case here. See also Anderson Country Club, supra. It may also be noted that the petitioner was never dissolved until all its stock had been transferred in October 1941 to another corporation whose charter provided that its purposes were purely charitable and that none of its members should receive any profit or remuneration. The respondent was in error in determining that petitioner is not entitled to the exemption provided by section 101 (6) of the Internal *201 Revenue Code and the corresponding sections or prior revenue acts for the taxable years 1929 to 1939, inclusive. The position of petitioner as to the effect of its application for exemption in 1929 and the letter of the deputy commissioner in answer thereto and as to the effect of its answer to the questionnaire and the ruling thereon of the respondent on April 28, 1938 is not clear. No estoppel is pleaded and there is no assignment of error in which the statute of limitations is expressly invoked, but in the petitioner's statement of facts it is said that the questionnaire and answer thereto "was the substantial equivalent of an income tax return for 1936, * * * that the Government should not under any circumstances attempt to collect for 1936 or prior years"; and "the limitation of three years should apply the same as if the returns were actually filed." In its brief petitioner makes no contention either that estoppel or the statute of limitations applies to the deficiency for any of the taxable years. In view of our conclusion that respondent erred in determining that petitioner is not entitled to the exemption claimed it is unnecessary to consider the effect of the action of *202 the respondent on petitioner's application for exemption in 1929 or of petitioner's answer to the questionnaire and the ruling thereon by the respondent. Decision will be entered for the petitioner Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - (6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, (and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;) [Parenthesis supplied] *↩